John P. Aldrich, Esq. (SBN #6877)
**ALDRICH LAW FIRM, LTD.**
1601 S. Rainbow Blvd., Suite 160
Las Vegas, Nevada 89146
Telephone: (702) 853-5490
Facsimile:  (702) 227-1975
*jaldrich@johnaldrichlawfirm.com*

Eduard Korsinsky, Esq. *(pro hac to be submitted)*
Steven J. Purcell , Esq. *(pro hac to be submitted)*
**LEVI & KORSINSKY LLP**
30 Broad Street, 24th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile:  (212) 363-7171
*spurcell@zlk.com*

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| GREG JACOBI, derivatively on behalf of nominal defendant ECHOSTAR CORPORATION,<br><br>          Plaintiff,<br><br>v.<br><br>CHARLES W. ERGEN, MICHAEL T. DUGAN, R. STANTON DODGE, , TOM A. ORTOLF, C. MICHAEL SCHROEDER, JOSEPH P. CLAYTON and DAVID K. MOSKOWITZ,<br><br>          Defendants,<br><br>and<br><br>ECHOSTAR CORPORATION,<br><br>          Nominal Defendant. | CASE NO.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**CIVIL ACTION**<br><br>**JURY TRIAL DEMANDED** |

1

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Greg Jacobi ("Plaintiff"), by the undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") on behalf of nominal defendant EchoStar Corporation ("EchoStar" or the "Company") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought for the benefit of nominal defendant EchoStar against its controlling shareholder and certain current and former members of the Company's Board of Directors (the "Board") to remedy the Board's breaches of fiduciary duties and waste of corporate assets.

2.      Charles W. Ergen ("Ergen") is the Company's executive Chairman and controlling stockholder. Ergen founded EchoStar Communications Corporation ("ECC") in 1980, and the company began offering satellite TV service in March 1996. In 2008, ECC changed its name to DISH Network Corporation ("DISH Network") and spun-off EchoStar.

3.      EchoStar is a holding company that, through its wholly-owned subsidiaries, (1) designs develops and distributes digital set-top boxes for satellite TV service providers and cable companies; (2) uses owned and leased in-orbit satellites to lease capacity to DISH Network, internet service providers and other customers; and (3) provides satellite broadband internet access to customers in North America.

4.      At the time of the spinoff transaction, Ergen became Chairman of the Board and CEO of EchoStar as well as Chairman of the Board, CEO and President of DISH Network. Ergen served as Chairman of the Board and CEO of EchoStar until November 2009, when he resigned from the position of CEO.  He served as CEO and President of DISH Network until June 2011.  Today he serves as Chairman of both EchoStar and DISH Network.

5.      In 2011, the Board granted Ergen 1.5 million stock options to purchase the Company's publicly-traded Class A common stock. The stock options were granted under the Company's shareholder-approved Amended and Restated Echostar Corporation 2008 Stock Incentive Plan (the "Incentive Plan") and were valued at approximately $21.6 million.

6.      In granting Ergen the 1.5 million stock options, the Board exceeded its authority under the Incentive Plan, which limits the amount of awards that could be granted to any individual to 800,000 shares for any calendar year. Accordingly, the 700,000 stock options granted to Ergen in excess of the 800,000 limit is *ultra vires* and should be rescinded.

7.      Moreover, the entire 1.5 million stock option award was fundamentally unfair to the Company and its shareholders. Ergen's outsize award is the product of an unfair process resulting in an unfair price. The stated purpose of the award was purportedly "to ensure that [Ergen] had appropriate incentives tied to the performance of EchoStar's Class A Shares." However, at the time of the award, Ergen already owned approximately 43.6% of the Company's Class A common stock, and thus he clearly already had the necessary incentive to ensure "performance" of EchoStar's Class A shares.

8.      Furthermore, as described in more detail below, the amount of the award – approximately $21.6 million – was exorbitant when compared to the peer group selected by the Board's Compensation Committee. For example, Cisco Systems, Inc., one of the Company's peers, awarded its chairman and CEO, John T. Chambers, $11,687,666 in compensation for Cisco's fiscal year ending July 28, 2012, which is approximately half of what Ergen received. This discrepancy is further magnified when one considers that Cisco's market capitalization is approximately $90.83 billion, almost *45 times* the size of Echostar's market capitalization of approximately $2.7 billion.

9.     The award is also incongruous when considered in light Ergen's now limited role at the Company. Indeed, when Ergen stepped down as CEO he no longer was responsible for managing the Company; his only role now is to provide "guidance" to management in his capacity as Chairman.   The award is also vastly out of proportion to Ergen's previous compensation as Chairman -- in 2009 and 2010 Ergen received compensation of less than $200,000 annually. No explanation was provided for the enormous increase.

10.     The process that led to Ergen's exorbitant compensation was unfair on its face. The Board did not engage in arms-length negotiations when determining the amount of compensation to award to Ergen.   Rather, the Board allowed its compensation committee, the members of which are effectively controlled by Ergen, to determine his compensation. In addition, the Board did not seek the guidance of any consultants or advisors to determine what a fair award should be. In all, both the value of the stock option award and the process used by the Board in granting the stock options was unfair to the Company and its minority shareholders. Indeed, all of the circumstances concerning the granting of the $21.5 million award suggest that the award is not in fact "compensation" at all, but is instead a *stealth dividend issued to the controlling shareholder* to the detriment of the Company and minority shareholders.

11.     As a result of the above misconduct, the Company and its minority shareholders have been harmed.

### JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds

1   $75,000.00, exclusive of interests and costs. Plaintiff is a citizen of Illinois and no defendant is a

2   citizen of Illinois.

3       13.     This action is not a collusive one to confer jurisdiction on a court of the United

4   States which it would not otherwise have.

5       14.     Venue is proper in this district because nominal defendant Echostar is

6   incorporated in this district.

7                                    **THE PARTIES**

8       15.     Plaintiff is, and has been continuously since January 1, 2008, the owner of

9   shares of EchoStar common stock. Plaintiff is a citizen of the state of Illinois.

10      16.     EchoStar is a corporation organized and existing under the laws of the State of

11  Nevada. The Company maintains its principal executive offices at 100 Inverness Terrace E.,

12  Englewood, Colorado 80112.

13      17.     EchoStar is a holding company that operates through its wholly-owned

14  subsidiaries, which in turn operate three business segments: EchoStar Technologies, EchoStar

15  Satellites Services and Hughes Communications, Inc. EchoStar Technologies designs, develops

16  and distributes digital set-top boxes for satellite TV service providers and cable companies.

17  EchoStar Technologies also provides digital broadcast operation services, primarily to DISH

18  Network. EchoStar Satellite Services uses owned and leased in-orbit satellites to lease capacity

19  to DISH Network, internet service providers and other customers. Hughes Communications,

20  Inc. provides satellite broadband internet access to customers in North America, and provides

21  broadband network services to domestic and international enterprise markets.

22      18.     Defendant Ergen has been the Chairman and a director of the Company since

23  2007. He previously served as Chief Executive Officer ("CEO") from 2007 until November

24

2009. As of March 7, 2011, Ergen owned 28,786,634 shares of Class B Common Stock, and held 56.0% of the Company's total voting power. Ergen therefore was the controlling shareholder of EchoStar at the time of the wrongdoing complained of herein and as such owed the Company and the minority shareholders fiduciary duties. As of March 7, 2012, Ergen had increased his control over the Company to 75.6% of total voting power. Ergen also serves as Chairman of the Board of DISH Network, and holds 90.4% of the voting power of that company. Ergen is a citizen of Colorado.

19.     Defendant Michael T. Dugan ("Dugan") has been CEO and President of the Company since November 2009, and has been a director of the Company since 2007. From January 1, 2008 until November 2009, Dugan served as "Senior Advisor" to EchoStar. Prior to that, Dugan was a director of DISH Network and served as Chief Technical Officer and Senior Advisor to DISH Network. Dugan is a citizen of Colorado.

20.     Defendant R. Stanton Dodge ("Dodge") has been a director of the Company since 2009. Dodge served as Executive Vice President, General Counsel and Secretary for the Company from October 2007 until November 2011. Dodge has served as the Executive Vice President, General Counsel and Secretary of DISH Network since 2007. Dodge is a citizen of Colorado.

21.     Defendant Tom A. Ortolf ("Ortolf") has been a director of the Company since 2007. Ortolf has served as a director of DISH Network since 2005, and is a member of DISH Network's Executive Compensation Committee. Ortolf serves on the Board's Compensation Committee, and was a member when the Compensation Committee granted the 2011 stock options challenged herein. Ortolf is a citizen of Colorado.

22.     Defendant C. Michael Schroeder ("Schroeder") has been a director of the Company since 2007. Schroeder serves on the Board's Compensation Committee, and was a member when the Compensation Committee granted the 2011 stock options challenged herein. Schroeder is a citizen of Arizona.

23.     Defendant Joseph P. Clayton ("Clayton") served as a director of the Company from 2008 until 2011. Clayton resigned from the Board and its committees as of June 20, 2011. DISH Network announced that Clayton was selected to serve as Chief Executive Officer and President of DISH Network on May 16, 2011, and he has served in such positions since resigning from the Echostar Board. Clayton was a member of the EchoStar Compensation Committee that granted the 2011 stock options challenged herein. Clayton is a citizen of Indiana.

24.     Defendant David K. Moskowitz ("Moskowitz") served as a director of the Company from 2007 until the Annual Meeting of Shareholders on May 3, 2012. Moskowitz currently serves as Senior Adviser to DISH Network and sits on its board of directors; he also served as its Executive Vice President, General Counsel and Secretary until 2007. Moskowitz is a citizen of Colorado.

25.     Defendants Ergen, Dugan, Dodge, Ortolf, Schroeder, Clayton and Moskowitz are collectively referred to herein as the "Defendants."

**THE DEFENDANTS' FIDUCIARY DUTIES**

26.     As officers and/or directors of Echostar, Defendants owed the Company and its shareholders the fiduciary obligations of due care, honesty, good faith, and loyalty. The Defendants were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. Specifically, the Defendants were and

are required to protect and act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. The Defendants owe an undivided and unselfish duty of loyalty to the corporation, and as such owe the Company and its shareholders the highest obligations of fair dealing.

27.     Moreover, Ergen, as the controlling stockholder of the Company, owed a separate fiduciary duty to the Company and its minority shareholders.

28.     With regard to a transaction where the controlling shareholder has a conflicting self-interest, such as the transaction complained of herein, all of the Defendants had a fiduciary duty to ensure that the transaction is entirely fair to the corporation. This duty requires the Defendants to ensure that the transaction involved fair terms and was consummated pursuant to a fair process, i.e. the circumstances concerning the proposal, negotiation, evaluation and approval of the transaction must have been fundamentally fair to the Company.

29.     Plaintiff alleges herein that Defendants breached their fiduciary duties by violating a shareholder-approved stock option plan and in the process granting an extravagant "compensation" award to the Company's controlling shareholder to the detriment of the Company and its other shareholders.

## FURTHER SUBSTANTIVE ALLEGATIONS

**Background**

30.     Ergen co-founded ECC in 1980 and served as its Chairman and CEO. ECC, through its DISH Network, became a leading provider of satellite delivered digital television to

1   customers across the United States. On January 1, 2008, the Company completed the spin-off

2   of its digital set-top box business and certain infrastructure and other assets, including certain

3   of its satellites, uplink and satellite transmission assets, real estate and other assets and related

4   liabilities into a separate publicly-traded company, EchoStar Corporation, formerly known as

5   EchoStar Holding Corporation. ECC retained its consumer business, including DISH Network.

6   In conjunction with the spin-off, ECC changed its name to DISH Network. Following the spin-

7   off, Ergen maintained voting control of both EchoStar and DISH Network. In addition,

8   following the spin-off, Ergen became Chairman and CEO of EchoStar and he retained the CEO

9   position until 2009.  He also continued to hold the position of Chairman and CEO of DISH

10  Network until 2011 when he stepped down as CEO.

11  **Ergen's Control of EchoStar**

12      31.     Following the creation of EchoStar and DISH Network, Ergen became

13  Chairman of the Board and CEO of EchoStar, and served in that dual capacity until November

14  2009, when he resigned from the position of CEO.  Ergen has continued to serve as executive

15  Chairman of the Company since November 2009.  His exact responsibilities as Chairman are

16  unclear.

17      32.     EchoStar's common stock is divided into two classes, Class A and Class B. The

18  Company's Class A common stock is publicly-traded and is quoted on the Nasdaq Global

19  Select Market under the symbol "SATS." The Company's Class B Common stock is not

20  publicly-traded.  Each of the Company's Class A shares is entitled to one vote per share on

21  each proposal to be considered by the Company's shareholders, and each of the Company's

22  Class B shares is entitled to ten votes per share.

23

24

33.     Ergen (and his family) own all of the Company's Class B common stock. As of February 14, 2011, 28,786,634 of the 47,687,039 outstanding shares of EchoStar's Class B common stock were held by Ergen and the remaining 18,900,405 were held in a trust for members of his family. As of February 14, 2012, 38,952,789 of the 47,687,039 outstanding shares of EchoStar's Class B common stock were held by Ergen, and the remaining 8,734,250 were held in a trust for members of his family.  By virtue of his beneficial ownership of all of the Company's Class B shares, Ergen has, and always has had, voting control of the Company. Specifically, Ergen has held 61.2% of voting power as of November 30, 2009, 56.0% of voting power as of November 30, 2010, and 75.6% of voting power as of November 30, 2011.

34.     As EchoStar's controlling shareholder, Ergen has had the ability to direct the actions of EchoStar in all matters requiring shareholder approval. As stated in the Form 10-K/A filed with the United States Securities and Exchange Commission ("SEC") on February 27, 2008:

> ***We are controlled by one principal shareholder.***
>
> Charles W. Ergen, our Chairman and Chief Executive Officer, beneficially owns approximately 50.0% of our total equity securities and possesses approximately 80.0% of the total voting power. Thus, Mr. Ergen has the ability to elect a majority of our directors and to control all other matters requiring the approval of our shareholders. . . . Mr. Ergen also beneficially owns approximately 50.0% of the total equity and 80.0% of the total voting power of DISH Network and continues to be the Chairman and Chief Executive Officer of DISH Network, which directly and through its subsidiaries continues to be our largest customer, accounting for a substantial majority of our revenues.

35.     A substantially similar statement is made in the Form 10-Ks filed with the SEC on March 2, 2009, March 17, 2010, February 24, 2011 and March 7, 2012.

36.   Moreover, EchoStar's business is heavily dependent on its relationship with DISH Network, another Ergen-controlled entity. As stated in the Company's latest Form 10-K Annual Report filed with the SEC on March 7, 2012:

> *We currently derive a substantial portion of our revenue from our two primary customers, DISH Network and Bell TV. The loss of, or a significant reduction in, orders from, or a decrease in selling prices of digital set-top boxes, transponder leasing, provision of digital broadcast services and/or other products or services to DISH Network or Bell TV would significantly reduce our revenue and adversely impact our results of operations.*
>
> DISH Network accounted for 59.9%, 82.5% and 81.3% of our total revenue for the years ended December 31, 2011, 2010 and 2009, respectively. Any reduction in sales to DISH Network or Bell TV or in the prices they pay for the products and services they purchase from us could have a significant negative impact on our business.

37.   Thus, the decisions made by Ergen as controlling stockholder and Chairman of DISH Network could have a significant impact on the Company. Accordingly, the Board must act to appease Ergen and is incapable of acting independently.

**The Compensation Committee**

38.   The Compensation Committee was not a committee of disinterested and independent directors. At the time of the grant, the Compensation Committee consisted of three members: Clayton, Ortolf, and Schroeder.  According to the Schedule 14A Proxy Statement filed by the Company with the SEC on March 24, 2011 (the "2011 Proxy"), the Compensation Committee was "composed solely of independent directors," and each of Claton, Ortolf and Schroeder were said to meet "the independence requirements of NASDAQ and SEC rules and regulations." These three individuals were the only purportedly "independent" directors on an entire board dominated by associates of Ergen, as described in the "Derivative and Demand Excused Allegations" section *infra*. In fact, Clayton, Ortolf and Schroeder were not independent.

39.     Barely one month after the transaction challenged herein, on May 16, 2011, it was announced that Clayton had been selected to serve as Chief Executive Officer and President of DISH Network.  In the press release announcing Clayton's selection as President and CEO of DISH Network, Clayton stated that "[his] working relationship with [Ergen] *spans nearly 20 years*."

40.     Ortolf also has a long and substantial relationship with Ergen. Ergen hired Ortolf to serve as President and Chief Operating Officer of ECC in 1988, long before ECC became a publicly traded company, and Ortolf served in those positions until 1991. After DISH Network became a publicly-traded company, Ergen chose Ortolf to serve as a director of DISH Network in 2005, a position he continues to hold. When EchoStar spun-off from ECC in 2008, Ergen selected Ortolf to also serve as a director of EchoStar.

41.     Schroeder served on the Board of ECC from 2003 until the spin-off, at which point he became a director of EchoStar. Ergen has elected Schroder to continue to serve on the Board ever since.

42.     Accordingly, the Compensation Committee was not in fact an independent committee capable of dealing with Ergen at arms-length.

**The 2008 Stock Incentive Plan**

43.     In connection with the spin-off from DISH Network, EchoStar adopted the 2008 Stock Incentive Plan, which provides for the granting of stock options, stock appreciation rights, restricted stock, restricted stock units, performance awards, dividend equivalents or other stock awards to the Company's employees. Awards granted pursuant to the Incentive Plan are intended to "promote the interests of EchoStar" by "aiding the Company in attracting and retaining Participants capable of assuring the future success of the Company, to offer such

1   personnel incentives to put forth maximum efforts for the success of the Company's business

2   and to afford such personnel an opportunity to acquire a proprietary interest in the Company."

3   The Incentive Plan was most recently amended and approved by the Company's shareholders

4   at the Annual Meeting of Shareholders held on May 11, 2009.

5       44.    The Board's Compensation Committee administers the Incentive Plan on behalf

6   of the Board. As described in the 2012 Proxy Statement:

7           The Compensation Committee operates under a Compensation Committee
            Charter adopted by the Board. The principal functions of the Compensation
8           Committee are, to the extent the Board deems necessary or appropriate, to:
            (i) make and approve all option grants and other issuances of EchoStar's equity
9           securities to EchoStar's executive officers and Board members other than
            nonemployee directors; (ii) approve all other option grants and issuances of
10          EchoStar's equity securities, and recommend that the full Board make and
            approve such grants and issuances; (iii) establish in writing all performance goals
11          for performance-based compensation that together with other compensation to
            senior executive officers could exceed $1 million annually, other than standard
12          stock incentive plan options that may be paid to EchoStar's executive officers,
            and certify achievement of such goals prior to payment; and (iv) set the
13          compensation of Mr. Ergen, who is our Chairman.

14      45.    The Incentive Plan has a clear and unambiguous limitation on annual grants of

15  stock options. Section 4(a) states:

16          Subject to adjustment as provided in Section 4(c), the number of Shares that may
            be issued subject to Awards under the Plan shall not exceed 16,000,000 (for
17          clarification purposes, this limitation applies to Incentive Stock
            Options); *provided, however,* that during the term of the Plan (i) *no Participant*
18          *may be granted Awards* (other than Awards described in clause (ii) below) *in the*
            *aggregate in respect of more than 800,000 Shares in any one calendar year* (for
19          clarification purposes, this limitation applies to Options and Stock Appreciation
            Rights) . . . .

20
    **The Compensation Committee Grants Ergen 1.5 Million Stock Options**
21
        46.    On March 31, 2011, the Compensation Committee awarded Ergen 1.5 million
22
    stock options to purchase EchoStar's Class A common stock. As described in the 2012 Proxy,
23
    the 1.5 million stock options were granted under the Incentive Plan.
24

13

47.     The 1.5 million stock options awarded to Ergen had an exercise price of $37.85 per share and vest at the rate of 20% per year beginning March 31, 2012. According to the 2012 Proxy, the 1.5 stock options awarded to Ergen had a grant date fair value of more than $21.6 million.

48.     The 1.5 million stock option grant violated the express provisions of the shareholder-approved Incentive Plan. By granting Ergen 1.5 million stock options, 700,000 above the annual limit set forth in the Incentive Plan, the Compensation Committee exceeded the authority granted to them under the shareholder-approved plan. Accordingly, the 700,000 shares granted to Ergen in excess of the 800,000 annual limit of the Incentive Plan is *ultra vires* and should be rescinded.

49.     In addition to the fact that it was *ultra vires*, the transaction was fundamentally unfair to the Company for a host of reasons.  First, there is the size of the award itself, was was grossly out of proportion when compared to the peer companies selected by the Compensation Committee. For example, Cisco Systems, Inc.'s chairman and CEO, John T. Chambers, received $11,687,666 in compensation for Cisco's fiscal year ending July 28, 2012, which was about half of what Ergen received. This discrepancy is even more unreasonable when considering that Cisco's market capitalization of approximately $90.83 billion as of October 31, 2012 is almost *45 times* the size of EchoStar's market capitalization of approximately $2.7 billion.

50.     A comparison to other peer company's compensation decisions is equally unfavorable.  Intelsat S.A.'s deputy chairman and CEO, David McGlade, received $2,287,198 for the company's fiscal year ending December 31, 2011. Loral Space & Communications, Inc.'s vice chairman of the board, CEO, and President, Michael B. Targoff, received

$3,563,887 for the fiscal year ending December 31, 2011.  Loral Space's market capitalization of approximately $2.4 billion is comparable to EchoStar's yet Ergen's award was several orders of magnitude higher. It is also highly significant that the peer company awards involved compensation for individuals serving as Chairman *and CEO*, while Ergen is merely EchoStar's Chairman.

51.     While Ergen serves as Chairman of the Board, Michael Dugan is doing the work of CEO and President.  Ergen's precise role and responsibilities as Chairman are vague at best. As stated in the 2012 Proxy, Ergen's is responsible for "primarily identif[ying] strategic priorities and lead[ing] the discussion and execution of strategy for the Corporation." As further stated in the 2012 Proxy, Ergen "provid[es] guidance to, and oversight of, management" but it is Dugan who manages the day to day operations of the Company.

52.     The fact that the award in question comes two years after Ergen stepped down as CEO is particularly baffling, as Ergen's responsibilities would seem to have been significantly reduced once he was no longer CEO.  Indeed, when Ergen stepped down as CEO of DISH Network in 2011, it was clear that he had been relieved of significant responsibility. As Defendant Clayton put it, Ergen, acting solely as Chairman of DISH Network, "won't be burdened by having to worry about the day-to-day" business operations of the company.[1]

53.     Second, in addition to the extraordinary size of the stock option award, the Compensation Committee did not negotiate for and/or receive adequate consideration (if any at all) in return.  According to the 2012 Proxy, the purpose of the stock option grant was "to ensure that [Ergen] had appropriate incentives tied to the performance of EchoStar's Class A

---

[1] Andy Vuong, "Dish president Ergen stepping down to strategize with acquisitions," THE DENVER POST, May 17, 2011, available at: http://www.denverpost.com/business/ci_18076510 (last visited October 29, 2012).

Shares." However, as described in the 2011 Proxy, as of March 7, 2011 (just weeks prior to the 1.5 million stock option award), Ergen already had beneficial ownership of approximately 43.6% of the Company's Class A common stock (in large part by virtue of his ability to convert his Class B common stock to Class A shares). Accordingly, Ergen already had all the incentive he needed to ensure "performance" of EchoStar's Class A shares. Thus, the stated rationale for the award, i.e. the consideration, simply makes no sense.

54.     The grant of over $21 million in stock options is excessive and unfair, especially when compared to the compensation received by Ergen in the years preceding the 2011 grant. As shown below, the 2011 grant increased Ergen's compensation exponentially while his compensation at DISH Network remained roughly the same:

| Year | EchoStar | DISH Network |
| --- | --- | --- |
| 2009 | $168,456 | $999,913 |
| 2010 | $124,144 | $797,909 |
| 2011 | $21,828,925 | $958,411 |

Until 2011, Ergen served as Chairman, CEO and President of DISH Network. The difference in Ergen's compensation between DISH Network and EchoStar in 2009-2010 reflects the different positions held by Ergen in each company. Yet in 2011, with Ergen no longer serving as CEO and President, the EchoStar Board inexplicably determined to grant Ergen more than $21 million in stock options, approximately *149 times* the average compensation he received as Chairman in 2009 and 2010.

55.     In so doing, the Compensation Committee did not consult any advisors or consultants. According to the 2012 Proxy, the Compensation Committee engaged a compensation consultant in August 2011, which was *after* the 2011 compensation decisions

were already made, and solely for the purpose of comparing the compensation of EchoStar's

officers to that of Hughes Communications, Inc., a company EchoStar had recently acquired. In

other words, the Board simply decided not to use the compensation consultant in connection

with the Compensation Committee's award of $21.6 million in stock options to the Company's

controlling shareholder. As stated in the 2012 Proxy:

> *Following the determination of each NEO's compensation for 2011 and the completion of the Hughes Acquisition, in August 2011* the Compensation Committee engaged Denver Compensation & Benefits, LLC ("Denver CAB") to provide executive compensation integration services to EchoStar. Specifically, Denver CAB was requested to compare and contrast certain of EchoStar's and Hughes' executive compensation practices and procedures, including, among other things, each company's general approach and philosophy towards executive compensation, each company's historical compensation practices, including the structure of compensation, the underlying time horizon of incentive grants, and the complexity and extent of the use of long-term incentives, as well as the current change-in-control and severance terms for each company's executive group. Additionally, Denver CAB was instructed to compare EchoStar's and Hughes' compensation practices within the context of the relevant geographic market for each company. *EchoStar did not use Denver CAB for any other services during 2011.*

56.    The totality of circumstances discussed above suggest that the $21 million

award is not in fact "compensation" at all, but rather a *stealth dividend issued to the*

*controlling shareholder*.

57.    Accordingly, the 1.5 million stock option award granted to Ergen was

fundamentally unfair to the Company and its shareholders and should be rescinded.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

58.    Plaintiff brings this action derivatively in the right and for the benefit of the

Company to redress the Defendants' breaches of fiduciary duties, waste of corporate assets and

unjust enrichment.

59.     Plaintiff is a shareholder of EchoStar, was a shareholder of EchoStar at the time of the wrongdoing alleged herein, and has been a shareholder of EchoStar continuously since that time.

60.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

61.     At the time of this filing, the Board consists of seven directors: defendants Ergen, Dugan, Dodge, Ortolf and Schroeder, and non-defendants Anthony M. Federico and Pradman P. Kaul (together, the "Current Board"). Five members of the Current Board were on the Board during the time of the alleged wrongdoing.

62.     Plaintiff has not made any demand on the Current Board to institute this action. Such demand would be a futile and useless act because the Current Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

63.     Demand is futile because the transaction at issue in this action did not result from a valid exercise of business judgment. In granting Ergen stock options in excess of the 800,000 limit set forth in Section 4(a) of the Incentive Plan, the Defendants (which includes a majority of the Current Board) violated an express, unambiguous provision of the shareholder-approved plan. Moreover, the size of the award was exorbitant when compared to the Company's peers and Ergen's limited role at the Company today.  In addition, the stated purpose of the award -- to provide incentive to a majority owner --  does not make sense.  All of these facts raise considerable doubt that the Board's actions (in granting, and/or by abdication of duty permitting the granting of the 1.5 million stock options) resulted from a valid exercise of business judgment. Accordingly any demand is excused.

64.     Current Board members Schroeder and Ortolf were members of the Compensation Committee, the committee responsible for administering the Incentive Plan, when the challenged award was made. The Compensation Committee's actions in *violating the express terms of the Incentive Plan* by definition could not have been a good faith exercise of business judgment. In addition, as a result of their actions, defendants Ortolf and Schroeder face a substantial likelihood of liability and therefore are incapable of objectively considering a demand. Thus, demand as to Ortolf and Schroeder is excused.

65.     Demand is also futile with respect to Defendant Ortolf, who has a long and substantial relationship with Ergen. Ergen hired Ortolf to serve as President and Chief Operating Officer of ECC in 1988, long before ECC became a publicly traded company, and served under Ergen until 1991. After DISH Network became a publicly-traded company, Ergen chose Ortolf to serve as a director of DISH Network in 2005, a position he continues to hold. When EchoStar spun-off from ECC in 2008, Ergen selected Ortolf to serve as a director of EchoStar.  At DISH Network Ortolf sits on the company's Executive Compensation Committee.  Thus, he has set compensation for Ergen for two separate companies, both of which are under Ergen's control. Ortolf's long relationship with Ergen and Ergen's selection of Ortolf to serve on the boards of both Echostar and DISH Network demonstrates that Ortolf is dominated and controlled by Ergen.  As such, Ortolf is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

66.     Defendant Ergen is incapable of considering a demand in this Action because he is neither disinterested nor independent. Ergen received the challenged shares and has a strong financial incentive to maintain the status quo and he will not authorize any corrective action that

1   would force him to disgorge the improperly obtained awards. Thus, Ergen is incapable of making

2   an independent and disinterested decision to institute and vigorously prosecute this action.

3       67.    Defendant Dugan is the Chief Executive Officer and President of the Company

4   and defendant Kaul is the President of a wholly-owned subsidiary of EchoStar. Both Dugan and

5   Kaul were paid more than $800,000 in compensation from EchoStar in 2011, and as such depend

6   on their employment with the Company for their livelihood. Furthermore, according to the 2012

7   Proxy, neither Kaul nor Dugan are considered independent under either the requirements of

8   NASDAQ or the SEC. Thus, Kaul and Dugan are incapable of making an independent and

9   disinterested decision to institute and vigorously prosecute this action.

10       68.    Defendant Dodge served as Executive Vice President, General Counsel and

11   Secretary for the Company from October 2007 until November 2011. Dodge has served as the

12   Executive Vice President, General Counsel and Secretary of DISH Network since 2007. Dodge

13   is controlled and dominated by Ergen, as he is dependent on Ergen for his continued employment

14   at DISH Network. Indeed, Dodge is not considered independent under either the requirements of

15   NASDAQ or the SEC according to the 2012 Proxy. As such, Dodge is incapable of making an

16   independent and disinterested decision to institute and vigorously prosecute this action.

17   **COUNT I**

18   **Against Defendants for Breach of Fiduciary Duties**

19       69.    Plaintiff incorporates by reference and realleges each and every allegation set

20   forth above, as though fully set forth herein.

21       70.    Each of the Defendants owed the Company and its shareholders the fiduciary

22   obligations of due care, good faith, and loyalty. In addition, with regard to any transaction where

23   the controlling stockholder had a conflicting self-interest, such as the transaction complained of

24

herein, Defendants had a fiduciary duty to ensure that the transaction was entirely fair to the Company.

71.     The Defendants breached their fiduciary duties by authorizing, approving, and/or by abdication of duty permitting stock option grants in violation of the terms of the Incentive Plan.

72.     In contemplating, planning, and/or effecting the foregoing conduct, the Defendants did not act in good faith toward the Company, exceeded their authority under Section 4(a) of the 2008 Incentive Plan and breached their fiduciary duties.

73.     Furthermore, the Defendants breached their fiduciary duties by failing to ensure that the transaction was entirely fair to the Company.

74.     As a direct and proximate result of the Defendants' breaches of fiduciary duties, the Company has sustained damages.

## COUNT II

### Against Defendant Ergen for Breach of Fiduciary Duties

75.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

76.     As the Company's controlling shareholder, Ergen owed the Company and its shareholders the fiduciary duty to ensure that all transactions between the Company and himself were entirely fair to the Company.

77.     Ergen knew, or absent recklessness should have known, that the challenged award of shares in stock options violated the 2008 Stock Incentive Plan. Surely, Ergen would have known what the 2008 Stock Incentive Plan provided with respect to his own compensation and thus he would also have known that the award he received in 2011 exceeded what was permitted under the Plan. Ergen nonetheless accepted the award for his own personal benefit and to the

detriment and expense of the Company. Ergen thus breached his fiduciary duties of loyalty and due care.

78.     Ergen further breached his fiduciary duties as a controlling shareholder by failing to ensure that the stock options awards was entirely fair to the Company.

79.     As a direct and proximate result of Ergen's breaches of fiduciary duties, the Company and its other shareholders have sustained damages.

## COUNT III

### Against Defendant Ergen for Unjust Enrichment

80.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

81.     Defendant Ergen was unjustly enriched by the receipt of proceeds from the award of 1.5 million shares in stock options, and it would be unconscionable to allow him to retain the benefits thereof.

82.     To remedy Ergen's unjust enrichment, the Court should order him to disgorge to the Company the 1.5 million stock options.

## COUNT IV

### Against Defendants for Waste of Corporate Assets

83.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

84.     The Defendants have caused and will cause the Company to waste valuable corporate assets by granting Ergen stock options in excess of what was authorized under the Incentive Plan.

85.     In granting Ergen stock option awards that exceeded an express and unambiguous limitation of the shareholder-approved Incentive Plan, the Defendants granted Ergen awards that no director acting in good faith would award, such that the awards constitute waste.

86.     The Defendants have caused and will cause the Company to waste valuable corporate assets by granting Ergen stock options in an amount so excessive and irrational so as to constitute a waste of corporate assets.

87.     As a result of this waste of corporate assets, the Defendants are liable to the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.      A declaration that the stock options awards granted to Ergen in 2011 were in excess of the 800,000 calendar year limit in the Incentive Plan and as such are void;

B.      Rescission of the stock option awards granted to Ergen in 2011;

C.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment and violation of the Incentive Plan, plus pre-judgment and post-judgment interest;

D.      Equitable and/or injunctive relief as necessary or permitted by law and equity, including disgorgement, attachment, impoundment, and/or imposition of a constructive trust on or otherwise restricting the disposition/exercise of the challenged stock option awards discussed herein;

E.      Directing EchoStar to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and policies and to

1  protect the Company and its shareholders from a recurrence of the damaging events described

2  herein;

3        F.     Awarding Plaintiff the costs and disbursements of this action, including

4  reasonable allowance of fees and costs for Plaintiff's attorneys, experts, and accountants; and

5        G.    Granting Plaintiff such other and further relief as the Court may deem just and

6  proper.

7  / / /

8  / / /

9  / / /

10                        **JURY TRIAL DEMANDED**

11 Plaintiff hereby demands a trial by jury.

12 Dated this 5TH day of December, 2012.

13                     **ALDRICH LAW FIRM, LTD.**

14

15                     John P. Aldrich, Esq. (SBN #6877)

16                     1601 S. Rainbow Blvd., Suite 160
                       Las Vegas, Nevada 89146

17                     Telephone: (702) 853-5490
                       Facsimile:  (702) 227-1975

18                     jaldrich@johnaldrichlawfirm.com

19                     Eduard Korsinsky, Esq. *(pro hac to be submitted)*
                       Steven J. Purcell , Esq. *(pro hac to be submitted)*

20                     **LEVI & KORSINSKY LLP**
                       30 Broad Street, 24th Floor

21                     New York, New York 10004
                       Telephone: (212) 363-7500

22                     Facsimile:  (212) 363-7171
                       *spurcell@zlk.com*

23                     ***Attorneys for Plaintiff***

24

## VERIFICATION

I, Greg Jacobi, under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Dated: November 30 , 2012

Greg Jacobi